*See Concurring and Dissenting Opinion*

Filed 10/2/23  In re A.V. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.V. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E080819 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2000189) |
| v. | OPINION |
| M.R., et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge.  Conditionally affirmed and remanded with directions.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant M.R.

Law Office of Melissa A. Chaitin and Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Appellant J.V.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsel for Plaintiff and Respondent.

In this appeal following the termination of parental rights, defendants and appellants M.R. (mother) and J.V. (father) contend that (1) the juvenile court abused its discretion by denying mother's pre-termination petition under Welfare and Institutions Code[1] section 388, which requested additional reunification services based on changed circumstances, and (2) the county welfare department failed to comply with California law implementing the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) by failing to ask several available extended family members whether the children have any Indian ancestry.[2] The department contends that the juvenile court "properly utilized its discretion" in denying mother's section 388 petition. Regarding ICWA compliance, the department contends in the alternative that (1) under *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743 (*Robert F.*) and *In re Ja.O.* (2023) 91 Cal.App.5th 672, 680-681, review granted July 26, 2023, S280572 (*Ja.O*), it had no duty to ask extended family members about possible Indian ancestry; (2) it satisfied its duty by conducting a reasonable inquiry; and (3) any error was harmless.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

2

We find no abuse of discretion in the denial of mother's section 388 petition. Absent further instruction from our Supreme Court, we reject the Department's arguments based on *Robert F.* and *Ja.O.* because we disagree with those cases' interpretation of the relevant statutes. We find the analysis of *In re Delila D.* (2023) 93 Cal.App.5th 953, (*Delila D.*) more persuasive. We disagree with the department that it conducted a sufficient inquiry, as it failed to ask several available extended family members about possible Indian ancestry. We also disagree with the department that the error was harmless, as the record indicates that there was "readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) We therefore conditionally affirm and remand with directions.

## I. BACKGROUND

Mother and father are the parents of A.V. (born August 2018), I.V. (born September 2019), J.V. (born October 2020), and X.V. (born August 2022).[3] Parental rights as to the three older children, but not the youngest, are at issue in this appeal.

In March 2020, plaintiff and respondent Riverside County Department of Public Social Services (the department) filed a dependency petition alleging that A.V. and I.V. came within section 300, subdivision (b)(1) (failure to protect) due to mother's unresolved substance abuse history and father's failure to protect. Both A.V. and I.V.

---

[3] Mother (born April 2000) was a minor herself when she became pregnant with her oldest child. Father is about two years older.

had tested positive for methamphetamines at birth. Attempts to address the department's concerns under a voluntary family maintenance plan had been unsuccessful. Several times, mother got clean and started participating in services, but each time she relapsed after a few months.

At the jurisdiction/disposition hearing in July 2020, father reported that he was no longer in a relationship with mother. The juvenile court sustained the dependency petition and removed A.V. and I.V. from mother's custody, but not father's. The court ordered reunification services for mother and family maintenance services for father.

In October 2020, the department obtained protective custody warrants to remove A.V., I.V., and their newborn sibling J.V. from parental custody. Mother and J.V. had both tested positive for drugs when J.V. was born, and mother admitted to "consistent use" of methamphetamine during the pregnancy, though she denied it was "daily use." The department placed A.V. and I.V. with a maternal great aunt, while J.V. was placed with a foster family. In supplemental dependency petitions (§ 387) filed a few days later, the department alleged A.V. and I.V.'s placement with father had not been effective in protecting them, as father did not participate in services and was allowing mother to reside in the home and supervise the children. A dependency petition filed as to J.V. alleged that he came within section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of sibling) because of mother's substance abuse and father's failure to protect. The juvenile court ordered all three children detained from both parents.

At the January 2021 jurisdiction and disposition hearing, the court sustained the allegations of the petitions, removed all three children from both parents, and ordered the parents to participate in reunification services.

Reunification efforts were unsuccessful. The court terminated mother's services in August 2021. She had participated in some services and achieved several periods of demonstrated sobriety, testing negative from February 3 until May 20, and again from June 10 to July 22. Nevertheless, she had also relapsed and tested positive on May 20 and June 4, and she was terminated from her substance abuse program on July 26 for missed drug testing and excessive absences. Her visitation with the children was inconsistent, and when visits did take place her interactions with the children were unsatisfactory in several respects. Specifically, the social worker observed that mother (and father) "were unable to properly divide their time" between the children and "would focus exclusively on one while ignoring the others." Also, the social worker opined that the parents relied too heavily on help from others attending the visitation. The parents "did not seem to understand" when the social worker encouraged them to "use the visit to build a positive bond with the children" rather than relying on others to take care of the children.

Father's services were continued longer than mother's, but were terminated in December 2021. Among other things, father suffered a drug overdose in September 2021, which had lingering and substantial effects on his health.

In April 2022, J.V. joined his siblings in the care of their maternal great aunt in preparation for possible adoption by her. The section 366.26 hearing was continued several times, to allow completion of an adoption assessment of the maternal great aunt and her family, and to give J.V. time to adjust to the new living arrangement. In the meantime, in August 2022, X.V. was born. The department did not file a dependency petition as to X.V., who remained in the care of mother and father while living with the paternal grandmother.

In November 2022, mother filed her section 388 petition requesting (among other things) reinstatement of her reunification services.[4] She supported the petition with evidence that she had completed a 90-day outpatient substance abuse program that included counseling and random testing, and that she had tested negative for drugs from August to November 2022. At the January 31, 2023 evidentiary hearing on mother's petition, she testified that she had achieved six months of sobriety. Mother also testified that the children were happy to see her at visitation, and sad when she leaves, stating that I.V., in particular is often upset at the end of visits: "[I.V.] usually cries and wants me to jump in the car with her, or they want to come home with us."

In a report submitted in advance of the evidentiary hearing, the department opposed reinstatement of reunification services. It acknowledged that, since services were terminated, the parents had maintained stable housing and employment, and mother

---

[4] Father, too, filed a section 388 petition, making similar requests, but he has not appealed the denial of his petition.

was starting a full-time job. Both parents had completed outpatient substance abuse treatment, mother continued to participate in aftercare services, and drug tests conducted before the start of visits with the children were negative. The parents' visitation had recently been consistent (though they sometimes arrived late) and appropriate. The social worker observed that the two older children interacted with the parents more, while J.V. "seems shy and stays close to the caregiver during visitation." None of the children had any "issues saying goodbye" to the parents at the end of visits.

Nevertheless, the department remained concerned that the parents were "only at the beginning of their road to recovery." Moreover, A.V. and I.V. had been placed with the maternal great aunt since 2020, while J.V. had been in her care since April 2022. All three children knew the maternal great aunt as "mom," and all had a "strong attachment" to her. She and her husband were "able and willing to provide permanency through adoption," and had consistently met all of the children's needs. The social worker opined that the children "appear much healthier and content than at the beginning of their dependency."

Minor's counsel, too, opposed granting parents any additional services, for similar reasons as the department.

The juvenile court denied mother's petition, finding that she had not established either that circumstances had sufficiently changed, or that the requested change of order would be in the children's best interests.

At the section 366.26 hearing later in February 2023, the juvenile court ordered parental rights terminated as to A.V., I.V., and J.V., freeing them for adoption by the maternal great aunt and her husband.

## II. DISCUSSION

### A. *Section 388 Petition*

Mother contends that the juvenile court abused its discretion by denying her request for additional reunification services. We find no abuse of discretion.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child." (*In re A.A.* (2012) 203 Cal.App.4th 597, 611.) "The [petitioner] bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child." (*Id.* at pp. 611-612.)

The juvenile court may consider the entire factual and procedural history of the case to determine whether the parent has made a showing of changed circumstances. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) "The change in circumstances supporting a section 388 petition must be material." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.) It must also "relate to the purpose of the order and be such that the modification of the prior order is appropriate." (*In re S.R.* (2009) 173 Cal.App.4th 864, 870.)

We review the juvenile court's determination for abuse of discretion, reversing only where a decision is beyond reason.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460.)

It is particularly difficult to establish materially changed circumstances when the problems that led to the dependency arose from sustained drug abuse.  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["[i]t is the nature of addiction that one must be 'clean' for a much longer period . . . to show real reform"]; see, e.g., *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 421-423 [seven months of sobriety insufficient].)

Nevertheless, mother has a plausible argument that she demonstrated materially changed circumstances.  Completion of a substance abuse program and six months of demonstrated sobriety are important accomplishments given mother's previously intractable substance abuse problem.  Mother's history of relapsing after several months of sobriety remains a concern, of course.  But there is tension, to say the least, between the department's position that she failed to demonstrate a material change in circumstances and its decision that it was safe to leave X.V. in mother's and father's care.

Even assuming a material change of circumstances, however, we do not find any abuse of discretion in the juvenile court's determination that further reunification efforts would not be in the children's best interests.  "When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.  [Citation.]  That need often will dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child."  (*In re Angel B.*, supra,

9

97 Cal.App.4th at p. 464, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  Thus, after reunification efforts have been terminated or bypassed, there is a rebuttable presumption that continued foster care is in the best interests of the child, and this presumption applies with even greater force when, as here, the permanent plan is adoption.  (*In re Angel B.*, at p. 464; *In re Stephanie M.*, at p. 317.)  "[A]fter reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

By the time mother achieved six months of sobriety, the two older children had already been in the care of the maternal great aunt for years, and J.V. for ten months— most of their lives—and J.V. had never lived with mother and father.  The children all referred to the maternal great aunt as "mom," and they were thriving in her stable home. The maternal great aunt and her husband had provided a nurturing environment for the children and were committed to continuing to do so through adoption.  There is little evidence of any similar bond between the children and mother.  And mother's relatively recent efforts to turn her life around and make her home safe for children, though commendable, do not compel the conclusion that those changes will be lasting.  Though mother casts additional reunification efforts as a way to "preserve the family unit," the evidence better supports the opposite conclusion; that further reunification efforts would only delay permanency for the children and undermine the stability of the family unit they already enjoy in the home of the maternal great aunt.

10

Because we find no abuse of discretion in the juvenile court's determination of the children's best interests, we will not disturb its ruling on mother's section 388 petition.

*B. ICWA*

During the dependency, mother and father both denied having any Native American ancestry, as did the paternal grandmother. The record does not demonstrate, however, that the department's ICWA inquiry included either the maternal great aunt, with whom A.V., I.V., and J.V. were placed, or a paternal second cousin who was considered as a possible placement for J.V. Relying on *Robert F.* and *Ja.O.*, the department contends that it had no duty to include extended relatives in its ICWA initial inquiry. The department's conclusion follows from those cases' reasoning. We are not persuaded, however, that the reasoning of those cases is correct.

Under California law, the juvenile court and county child welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); see *In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*D.F.*, at p. 566.) Only the first of these phases is at issue in this appeal.

In every dependency proceeding, the department has an initial duty to inquire into whether a child is an Indian child. (*In re J.S.* (2021) 62 Cal.App.5th 678, 686.) "The department's 'duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information

11

that the child may be an Indian child.'" (*Robert F.*, *supra*, 90 Cal.App.5th at p. 499; see § 224, subd. (a); Cal. Rules of Court, rule 5.481, subd. (a) (rule 5.481).) "In addition, '[f]ederal regulations require state courts to ask each participant "at the commencement" of a child custody proceeding "whether the participant knows or has reason to know that the child is an Indian child."'" (*Robert F.*, at pp. 499-500; see 25 C.F.R. § 23.107(a) (2022).) As well, state law requires the court to inquire ""'[a]t the first appearance in court of each party"'" by asking ""'each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child." (§ 224.2, subd. (c).)'" (*Robert F.*, at p. 500.)

"[U]nder subdivision (b) of section 224.2, '[i]f a child is placed into the temporary custody of a county welfare department pursuant to Section 306,' the department's obligation includes asking the 'extended family members' about the child's Indian status."[5] (*Robert F.*, *supra*, 90 Cal.App.5th at p. 500.) This language was added by Assembly Bill No. 3176 (2017-2018 Reg. Sess.), which made various ICWA related changes to the Welfare and Institutions Code, effective January 1, 2019. (Stats. 2018, ch. 833 (A.B. 3176), § 5.) Similar language appears in rule 5.481 of the California Rules of Court, which the Judicial Council revised to implement section 224.2, subdivision (b): "The party seeking a foster-care placement, . . . termination of parental rights,

---

[5] Section 224.2, subdivision (b), also applies when a child is placed in the temporary custody of a county probation department pursuant to section 307. But then it is the county probation department's duty of inquiry, and not the county welfare department's. (See § 224.2, subd. (b).)

12

preadoptive placement, or adoption must ask the child, if the child is old enough, and the parents, Indian custodian, or legal guardians, *extended family members*, others who have an interest in the child, and where applicable the party reporting child abuse or neglect, whether the child is or may be an Indian child . . . ."  (rule 5.481 (italics added).)

Following the concurring opinion in *In re Adrian L.* (2022) 86 Cal.App.5th 342, 357-358 (*Adrian L.*), *Robert F.* equates the phrase "'placed into the temporary custody of a county welfare department pursuant to Section 306'" with exercise of the department's authority under section 306, subdivision (a)(2) "to take children into temporary custody 'without a warrant' in certain circumstances."  (*Robert F.*, *supra*, 90 Cal.App.5th at p. 497; see *Adrian L.*, *supra*, 86 Cal.App.5th at pp. 357-358 (conc. opn. of Kelley, J.).)  According to *Robert F.* and the *Adrian L.* concurrence, "[a] department that takes a child into protective custody pursuant to a warrant does so under section 340, not section 306."  (*Robert F.*, at p. 497.)  *Ja.O.* adopted the same reading of section 224.2, subdivision (b).  (*Ja.O.*, *supra*, 91 Cal.App.5th at pp. 680-681.)

Recently, however, *Delila D.* declined to follow *Robert F.*, finding its holding "contrary to both the letter and spirit of [A.B. 3176]."  (*Delila D.*, *supra*, 93 Cal.App.5th at p. 962.)  Instead, *Delila D.* concluded "there is only one duty of initial inquiry, and that duty encompasses available extended family members no matter how the child is initially removed from home."  (*Ibid.*)  Under *Delila D.*'s analysis of section 224.2, subdivisions (a) and (b), together with rule 5.481, social workers have "a duty of initial inquiry that begins at first contact, lasts throughout the proceeding, and includes 'but is not limited to'

13

the reporting party, the child's parents and extended family members, and others who have an interest in the child, as those individuals become available during the case." (*Delila D.*, at p. 966.)

This conflict in authority is currently under review by our Supreme Court, with *In re Ja.O.* as the lead case. We find *Delila D.*'s thoughtful discussion of the statutory language and legislative history persuasive, and adopt its reasoning and conclusions, pending our Supreme Court's resolution of the conflict.

Applying *Delila D.* to this case, the department's initial duty of inquiry—including the ongoing duty to inquire of extended family members who become available during the case—was triggered when A.V., I.V., and J.V. were removed from parental care in October 2020, and the department then maintained them in temporary custody, as authorized by section 306, subdivision (a)(1). We decline to follow the reasoning of *Ja.O.*, *Robert F.*, or the *Adrian L.* concurrence that would lead to a different result.

Our next questions, then, are whether the department satisfied that expanded duty of inquiry and, if not, whether failing to do so was harmless. We answer both questions in the negative.

Relying on *In re Ezequiel G.* (2022) 81 Cal.App.5th 984 (*Ezequiel G.*) and *In re J.K.* (2022) 83 Cal.App.5th 498 (*J.K.*), the department argues that the ICWA inquiry it conducted was adequate, even though it did not "contact every extended family member

14

including every aunt, uncle, and first and second cousin."[6]  Certainly, we agree that the department was only required to make "*reasonable* and diligent efforts to conduct the required inquiry and report those efforts and the results thereof to the court."  (*J.K.*, at p. 508, fn. 7.)  No one is asserting that the department was required to "undergo overly voluminous record searches, attend family reunions, conduct stakeouts, or search Ancestry.com.  Nor [is it] required to interview young children or other extended family members who would not be expected to have any information regarding the child's Indian status."  (*Ibid.*)  We are not persuaded, however, that an inquiry may be considered reasonable and diligent when the department fails to inquire of extended relatives who *are* readily available and reasonably might have information regarding the child's Indian status.  To the extent *Ezequiel G.* holds otherwise, we decline to follow it.

In short, the department did not fulfill its duty of initial inquiry under ICWA because it failed to ask two readily available extended relatives whether the children are or might be Indian children.  The trial court erred by finding ICWA did not apply even though the department had not fulfilled its duty of initial inquiry.  We turn, then, to the issue of whether the error should be considered harmless error.

There are multiple approaches to assessing harmlessness in the ICWA context, and the issue is currently under review by our Supreme Court.  (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, 777-782, review granted Sept. 21, 2022, S275578).)  We will apply the

---

[6] Perplexingly, this argument is buried in a section of the department's brief that otherwise addresses whether any error was prejudicial.  Nevertheless, we exercise our discretion to consider its substance.

15

approach we described in *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 739.  That is, we will find prejudice when an agency "fail[s] to investigate readily obtainable information tending to shed meaningful light on whether a child is an Indian child."  (*Ibid.*)  Even where the agency has erred, however, it may be that, "considering the entire record, it was obvious that additional information would not have been meaningful to the inquiry." (*Id.* at p. 743.)  "This might occur where the evidence already uncovered in the initial inquiry was sufficient for a reliable determination."  (*Ibid.*)

There are circumstances where the record could demonstrate that the initial inquiry was sufficient for a reliable determination, even though there was an erroneous failure to inquire of some extended relatives.  For example, in theory, the department could have uncovered information affirmatively showing the children were disqualified from tribal membership.  (Cf. *In re J.M.* (2012) 206 Cal.App.4th 375, 382 [tribe's membership criteria showed children disqualified from membership "irrespective of their great-great grandparents' possible membership in the tribe"].)  In some circumstances, a thorough, but not perfect, inquiry can suffice for a reliable determination, despite some omissions.  (See *In re Rylei S.* (2022) 81 Cal.App.5th 309, 325 [discussing hypothetical where agency "interviews the maternal grandfather; several, but not all of his four siblings, and the maternal grandfather's surviving parent, none of whom indicates the family has any Indian ancestry," and concluding that the "failure to interview the grandfather's remaining siblings would certainly be harmless absent some unusual circumstance"].)  The record in this case, however, demonstrates nothing of the sort.

16

The department emphasizes that mother and father consistently denied Native American ancestry, as did paternal grandmother, concluding from that premise that the error must be harmless. This line of reasoning ignores that a parent or other relative may deny Indian ancestry, but an interview with another available extended family member may nevertheless reveal such ancestry. (See *In re Y.W.* (2021) 70 Cal.App.5th 542, 554 [to accept parent's denial of any knowledge of Indian ancestry, without further inquiry, "ignores the reality that parents may not know their possible relationship with or connection to an Indian tribe"]; *In re T.G.* (2020) 58 Cal.App.5th 275, 289 ["Oral transmission of relevant information from generation to generation and the vagaries of translating from Indian languages to English combine to create the very real possibility that a parent's or other relative's identification of the family's tribal affiliation [or lack thereof] is not accurate"].) Here, the department's initial inquiry did not include any extended family members on the maternal side, and only a single paternal extended relative. We reject the notion that a reliable determination of a child's Indian status can or should be made from such a limited inquiry when other relatives are readily available and may have different information.

## III. DISPOSITION

The order denying mother's section 388 petition is affirmed. The orders terminating parental rights to A.V., I.V., and J.V. are conditionally affirmed. We remand to the juvenile court for the department and the court to comply with the inquiry and notice provisions of ICWA and California law consistent with this opinion, including

17

inquiring of extended family members.  If the court finds the children are Indian children, it shall conduct a new section 366.26 hearing, as well as all further proceedings, in compliance with ICWA and related California law.  If not, the court's original section 366.26 orders will remain in effect.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

I concur:

RAMIREZ _____
P. J.

[*In re A.V.*, E080819]

FIELDS J., Concurring and Dissenting.

I fully concur in the majority's decision in this case except its determination adopting the reasoning and holding of this court's decision in *In re Delilah D.* (2023) 93 Cal.App.5th 953, regarding the scope of the ICWA inquiry required in this case. I continue to agree with and follow this court's decisions on the ICWA inquiry question in *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743; *In re Ja.O.* (2023) 91 Cal.App.5th 672, review granted July 26, 2023, S280572; and *In re Andres R.* (2023) 94 Cal.App.5th 828.) Thus, I would affirm the decision of the juvenile court in its entirety.

FIELDS
J.

1